IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No: 5:11-CR-65-FL

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | **MEMORANDUM AND** |
| v. ) | **RECOMMENDATION** |
| ) | |
| DANIEL HERNANDEZ SANCHEZ, ) | |
| ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the Motion to Suppress [DE-33] filed by Defendant Daniel Hernandez-Sanchez ("Defendant"). The motion was referred to this court and is considered here as a recommendation to the District Court. *See* 28 U.S.C. § 636(b)(1)(B); FED. R. CRIM. P. 59(b)(1). The government has responded to the motion [DE-37] and the court held a hearing on 16 June 2011 to further develop the record. Accordingly, the motion is ripe for review. For the reasons stated below, it is recommended that Defendant's motion be denied.

## I. PROCEDURAL BACKGROUND

On 15 March 2011, a grand jury sitting in the Eastern District of North Carolina returned a single count indictment against Defendant, charging him with being an illegal alien in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(5) and 924. Defendant has filed a motion seeking the suppression of a loaded firearm seized following the search of Defendant's motor vehicle. At the suppression hearing, the government presented the testimony of Steve Cardwell ("Agent Cardwell") and William McLane ("Agent McLane"), both Special Agents of the Immigration and Customs Enforcement ("ICE"), and Defendant testified on his own behalf. Hr'g

Tr. ("Tr.") at 2-3, 29, 74.

## II. STATEMENT OF THE FACTS

Defendant challenges the consensual nature of the search performed on his vehicle and the resulting seizure of a firearm which occurred on 23 February 2011 in the curtilage area of 33 Serenity Lane, Lillington, North Carolina ("33 Serenity Lane").

A.  <u>Testimony of Agent Cardwell</u>

On 23 February 2011, Agents Cardwell and McLane and two other ICE agents, Brian Padian ("Agent Padian") and Candace Stallings ("Agent Stallings"), along with a Harnett County sheriff deputy (Greg Teller) and two Lee County sheriff deputies (Captain John Holly and Deputy Sturcke), were conducting an "office law enforcement operation" or a "knock and talk" on several residences in Harnett and Lee counties, including 33 Serenity Lane, believed to be connected to a narcotic smuggling operation. Tr. 4-5, 7-8, 21, 36, 39. Agent Padian served as the group supervisor. Tr. 9. Agent Cardwell testified "various sources" had identified the residence as being a stash house used by drug dealers to store drugs and money. Tr. 15. He testified further that arrest of one of ICE's "main targets" in the narcotic investigation the day prior to the "knock and talk" lead to the discovery of a driver's license on his person with the address of 33 Serenity Lane. Tr. 4.

In preparing for the "knock and talk" at 33 Serenity Lane, the ICE agents and other law enforcement officials conducted surveillance from a staging area located "a short distance" from the residence. Tr. 5; *see* Ex. A [DE-37.2] (aerial photo denoting the staging area relative to the residence). Agent Cardwell testified that at the staging area, law enforcement discussed the specific roles of each official and agreed that the "knock and talk" was to be conducted in a non-threatening manner. Tr. 8-9. Accordingly, there were no marked law enforcement vehicles and all officers were

2

in plain clothes, with the exception of Agent Stallings, who wore a service-issued ballistic vest displaying either "ICE" or "POLICE."[1] Tr. 9, 14, 22. Agent Cardwell testified further that Agent Stallings' service weapon was exposed. Tr. 22. Agent Cardwell wore a windbreaker, which contained no police insignia or law enforcement identification of any kind and concealed his service weapon. Tr. 9, 20. Prior to establishing the staging area, Agent Cardwell had driven by 33 Serenity Lane and noticed two vehicles – a yellow Mitsubishi sedan and a white SUV – parked in front of the residence. Tr. 5-6, 10. In particular, both vehicles were parked in front of the stoop or stairs to the front entrance of the home with the white SUV located to the immediate right of the yellow Mitsubishi. Tr. 6. Agent Cardwell observed the residence from the staging area for approximately two hours and in that time, did not see any vehicles enter or exit 33 Serenity Lane. Tr. 5, 16-17. A fence surrounded the home with the exception of an entry point wide enough for the entry and exit of a single vehicle. Tr. 17-18.

After observing the premises, Agents Padian and Cardwell, riding in the same unmarked government vehicle, entered the property, and noticed two females walking down the front stairs of the residence. Tr. 9-10, 16. Agent Padian parked his car behind the yellow Mitsubishi. Tr. 10. According to Agent Cardwell, the agents were unaware that the yellow Mitsubishi, which had darkly tinted windows, was occupied. Tr. 10-11, 17-18. Agent Cardwell testified that the parking area in front of the home was "a very big lot" affording ample parking. Tr. 19. As Agent Padian approached the driver's side of the yellow Mitsubishi, Agent Cardwell initiated a conversation with the two females. Tr. 10, 27. Agent Cardwell testified that during his conversation with the two

---

[1] Agent McLane testified, however, that he wore a marked jacket displaying "Police and ICE." Tr. 31.

females, Agent Padian notified him that an individual, later identified as Defendant, was in the yellow Mitsubishi. Tr. 10. While talking to the females, Agent Cardwell overheard Agent Padian ask Defendant for his identification and to exit the vehicle. Tr. 11, 25. Meanwhile, Agent Cardwell continued talking to the females and ascertained that one of the females was an occupant of the residence. Agent Cardwell sought and received her consent to speak with her inside the residence and subsequently obtained her written consent to search the home. Tr. 11, 16, 24. Only Agents Cardwell, Padian and Stallings entered the home. Tr. 27.

With respect to the presence of other agents, Agent Cardwell testified that by the time he entered the residence, a total of four or five unmarked law enforcement vehicles were parked near the yellow Mitsubishi. Tr. 12, 19. Agent Cardwell testified further that it would have been difficult for the driver of the yellow Mitsubishi to leave the property because of where the law enforcement vehicles were parked. Tr. 19. Agent Cardwell did not see any of the vehicles utilize their police lights throughout the encounter. Tr. 14.

B.  Testimony of Agent McLane

Agent McLane testified that when he reported to the staging area, a briefing ensued wherein the law enforcement officials were advised that the operation would be a "soft approach" or "low key." Tr. 31. The law enforcement officials were also informed that Agents Cardwell and Padian would make the initial approach and the remaining officials would enter the premises for security purposes. Tr. 31. Agent McLane wore a marked jacket with "Police and ICE" written on it but kept his service weapon concealed. Tr. 31. Agent McLane testified that county law enforcement officials wore plain clothes and he did not recall any of them wearing vests with "Sheriff" written on it. Tr. 54. Agent Stallings wore a bulletproof vest with ICE written on it and her gun was exposed. Tr. 55.

4

The three deputies from Lee and Harnett counties assisted ICE with the knock and talk because the operation involved illegal drug activity in both counties and the drug trafficking organization being investigated "was known to be violent." Tr. 64.

Agent McLane explained that the plan was for the remaining ICE agents and the county deputies to remain at the staging area and await confirmation from Agents Cardwell and Padian that they had obtained consent to search the premises. Tr. 32. While Agent McLane could view the home from the staging area, his view was partially impeded by a six-foot fence surrounding the house. Tr. 32, 63. In particular, the layout of the fence and his field of vision made it difficult to determine whether he was looking at the home at 33 Serenity Lane or a home adjacent thereto. Tr. 63. He stated further that the fence made it difficult to ascertain the location of the driveway. Tr. 63.

As Agent McLane watched Agents Cardwell and Padian enter the property, at one point he lost sight of their vehicle due to the fence. Tr. 63, 69. Thus, due to a limited view combined with a concern that he could not reach the premises quickly if a problem ensued, Agent McLane left the staging area for a location across the street which offered a better view of the premises. Tr. 32. From this vantage point, when he saw Agent Cardwell appear on the front steps of the residence Agent McLane left this second location and drove to the residence. Tr. 33. Agent McLane entered the property and parked his vehicle – an unmarked Pontiac Bonneville and the second one to enter the property – to the right of the SUV, which had a female standing beside it. Tr. 33-34, 67. While Agent McLane could not recall Agent Padian parking directly behind the yellow Mitsubishi, he explained that it would have been "very difficult" but not impossible for someone driving the vehicle to leave the property. Tr. 51, 57-58, 67. Agent McLane testified that a total of four law enforcement

5

vehicles were on the premises. Tr. 73.

As Agent McLane exited his vehicle, he was motioned by Agent Padian who advised him that Defendant claimed to be a lawful permanent resident ("LPR") but indicated that Defendant did not have his green card, which, according to Agent McLane, as a permanent resident, Defendant is required to carry at all times. Tr. 34-35, 44, 50, 59. When questioned about the location of his green card, Defendant provided Agent McLane with three inconsistent statements, advising initially that he had one, then that he did not have one and finally that it had been taken from him.[2] Tr. 35. At that point, Agent McLane believed he had the right to ask Defendant further questions regarding his immigration status. Tr. 59. Agent McLane continued to question Defendant, asking where he was born, his reason for being on the premises and where he was employed. Tr. 36-37. Agent McLane testified that Defendant explained he owned a tire shop, was the owner of both the white SUV and the yellow Mitsubishi and was visiting the premises to either pick up or meet someone who was going to clean his house. Tr. 37, 39. Agent McLane described his communications with Defendant as including "some small talk." Tr. 37. Thereafter, Agent Padian exited the home, advising officers that the female occupant had consented to a search of the home. Tr. 38. Agent Padian advised the officers further to seek consent to search the yellow Mitsubishi and the white SUV. *Id.* Agent McLane testified that Captain Holly, who was standing near Agent McLane and Defendant, sought and received Defendant's consent to search both the white SUV and the yellow Mitsubishi. *Id.*

While Captain Holly searched the yellow Mitsubishi, Agent McLane searched the SUV with the assistance of either Deputy Sturcke or Officer Teller. Tr. 39, 40, 61. During the search of both

---

[2] Agent McLane recalled having Defendant's driver's license but did not remember Defendant handing it to him. Tr. 43, 50.

6

vehicles, Defendant, who stood between the yellow Mitsubishi and SUV, was only a "few steps" away from the SUV. Tr. 38, 40. Agent McLane testified that he was within hearing distance of Defendant and in fact, overheard Captain Holly and Defendant discussing a loaded firearm Captain Holly had found in the yellow Mitsubishi. Tr. 41. In particular, Agent McLane heard Defendant's statement to Captain Holly that the gun was legal and registered and that Defendant had purchased the firearm from "a cop." *Id.* Agent McLane testified that Defendant remained polite throughout the search and acted "very casual" following the discovery of the gun. Tr. 44-45.

Following the search of the SUV, Agent McLane called the Law Enforcement Support Center ("LESC") in order to confirm Defendant's immigration status.[3] Tr. 35, 42-43, 53. Once Agent McLane confirmed Defendant's illegal immigration status, he placed Defendant under arrest and drove Defendant to the police station. Tr. 43-45. Agent McLane estimated that he was at 33 Serenity Lane for no more than twenty minutes and that his time was divided between talking to Defendant, searching the white SUV and verifying Defendant's immigration status with LESC. Tr. 57, 59.

C.   Testimony of Defendant

Defendant testified that he and his three children have lived in Lillington, North Carolina for almost nine years. Tr. 75. Defendant testified he has a 12th grade education, which he received in Mexico, and that he has no criminal convictions outside of traffic-related incidents. Tr. 91-92.

---

[3] Agent McLane testified that verifying Defendant's immigration status took additional time due to poor cell phone reception. Tr. 42. At one point, Agent McLane moved a few feet to the right of the SUV in hopes of getting better cell phone reception and in so doing, noticed a taped coffee can or jar in the yard located to the right of the house near the fence. Tr. 42, 56, 70-71. Agent McLane could not recall whether anyone asked Defendant to move towards the back or right side of the house to identify the jar but noted that he did not keep his eyes on Defendant the entire time. Tr. 56, 70.

7

Defendant owns a .380 caliber Bersa, the subject firearm, which he purchased from a police officer. Tr. 88, 93. Defendant stated it was his understanding that the gun was registered to him personally; however, he did not know who registered the gun for him nor the county in which it was registered. Tr. 96, 108.

Defendant explained he drove to 33 Serenity Lane in the yellow Mitsubishi on 23 February 2011 to pick up both females who had agreed to clean his home. Tr. 75, 92, 105. The females were unable to drive to Defendant's home because the vehicle they had borrowed from Defendant, the white SUV, had a fuel leak. Tr. 75, 92, 105. Defendant explained that one of the females was a customer of his tire shop and had recently brought Defendant her car for repair. Tr. 75. However, while the car was in the shop, the car was repossessed. Tr. 75, 104. Knowing the female was a single parent with financial problems, Defendant loaned her the SUV in exchange for cleaning services provided by the female. Tr. 76, 104. Defendant explained he was on the premises approximately 20 to 30 minutes prior to the arrival of the agents. Tr. 104.

Defendant testified that while sitting in his car with the front windows down, Agent McLane parked directly behind Defendant, and subsequently a Hummer parked behind the SUV and a white car then parked behind the Hummer. Tr. 77, 97. Defendant did not recall seeing Agent Padian's vehicle arriving before that of Agent McLane but he recalled seeing two officers enter the residence. Tr. 97, 100. In fact, Defendant has no specific recollection of any contact he had with either Agent Padian or Agent Cardwell. Defendant was unable to move his car which was parked directly in front of the front stairs. Tr. 77-90. At the time the other agents arrived, Defendant explained only one woman was outside – a black female from the Dominican Republic who did not speak English – and that she was placing cleaning supplies in Defendant's yellow Mitsubishi. Tr. 80, 100-01. Defendant

8

testified that prior to being asked his name or to show identification, Defendant was ordered to exit his vehicle, walk to the back of it and place his hands on the trunk, at which point Defendant's pockets and wallet were searched.[4] Tr. 77-78, 81, 98-100. As Defendant walked to the back of the car, he was accompanied by three law enforcement officials, including Agent McLane and Agent Stallings. Tr. 78, 91. Defendant testified that the agents did not identify themselves although Defendant noticed Agent McLane put on a vest as he exited his vehicle. Tr. 89. During the search of his person, which "didn't take long," Defendant advised that he had a knife in his pocket in response to questioning by agents. Tr. 99. Defendant did not recall who searched his person. Tr. 91, 100. Defendant testified that once instructed to stand behind the car, he felt he could not leave and in fact was told he could not leave in response to his request to do so. Tr. 79. Defendant testified further that he felt threatened during the entirety of the investigation and never felt free to leave. Tr. 86-87. Defendant explained Agent Stallings wore a vest and had a service weapon. Tr. 78. After Defendant's person was searched, Defendant produced a valid driver's license in response to a request for identification. Tr. 80. At some point, Defendant explained to the agents that he had nothing to do with the house and that he was there to pick up one of the females, who was in the process of bringing cleaning supplies to the car. Tr. 79-80.

Subsequent to the search of Defendant and in response to whether he had any weapons or drugs in his car, Defendant admitted to having a .380 caliber Bersa gun in the glovebox of his car and immediately thereafter Defendant's car was searched. Tr. 87-88, 93, 106. Defendant testified

---

[4] Defendant testified that he did not recall whether any law enforcement official advised that the purpose of their visit to 33 Serenity Lane was to conduct a "knock and talk." Tr. 79. When asked whether that term was "familiar" to him, Defendant testified that the officials "had some axes with them." *Id.*

9

Case 5:11-cr-00065-H Document 55 Filed 07/08/11 Page 9 of 19

that Officer Holly, while opening one of the car doors, asked Defendant whether any weapons or guns were in the car but never sought Defendant's consent to search the vehicle. Tr. 87-88, 106. Defendant explained at the time of the search of his vehicle, Agent Stallings was standing two to three feet away from Defendant with her hand on her weapon while Agent McLane was on the other side of the vehicle conducting the search. Tr. 85-86, 88. Defendant explained further that the Dominican female stood beside Agent Stallings during the entirety of the investigation. Tr. 102. Defendant testified that after verifying the gun's registration, one of the agents returned the gun to the glove compartment. Tr. 87-88.

Defendant testified that after the search of his vehicle, an unidentified official – not Agents McLane, Cardwell or Stallings – directed Defendant to an area of the yard between the front of the house and the side porch (located on the right side of the house) and advised Defendant that if Defendant identified the location of the drugs, the official would let Defendant leave. Tr. 81-83, 85, 101-02. Defendant testified the conversation with the unidentified official lasted approximately five minutes. Tr. 83. Defendant explained he had no knowledge regarding any drugs and notified the official that he works each day, tends to his children, attends church each night then returns home. Tr. 84. Defendant stated in response to this explanation, the official said "I know how ya'll work" and took Defendant to Agent McLane's vehicle. Tr. 84-85. Defendant explained that during this conversation, Agent McLane was searching one of the vehicles; however, Defendant did not recall seeing Agent Cardwell. Tr. 83-84. Defendant recalled seeing the jar or coffee can which contained a black substance and that the "officers" used a knife to open the jar then threw it away. Tr. 103.

### III. DISCUSSION

Defendant has moved to suppress the firearm on the grounds that it was obtained from an

illegal seizure of Defendant and a subsequent search of Defendant's vehicle.

Before addressing the substantive issues, the court must consider the credibility of the witnesses given the divergent nature of the testimony of Defendant and Agents Cardwell and McLane. *See United States v. Stevenson*, 396 F.3d 538, 542-43 (4th Cir. 2005) (noting that assessing the credibility of witnesses is the province of the district court). The court finds the testimony of Agents Cardwell and McLane credible. Both were forthright in their responses and their demeanor was calm and courteous and their testimony was reasonable. However, the court finds Defendant's testimony lacking in credibility. In particular, the court finds unreliable and rejects Defendant's testimony that a law enforcement official ordered Defendant out of the car and frisked his person prior to requesting identification and that Defendant was not contacted by Agent Padian. Both Agents Cardwell and McLane testified to the contrary. Agent Cardwell advised that while he was speaking to the two females, he overheard Agent Padian ask Defendant for identification, in addition to asking Defendant to exit the vehicle. This testimony is further supported by that of Agent McLane who testified that upon his arrival, he was motioned by Agent Padian who advised that Defendant claimed to have legal immigration status but was unable to produce his green card. The court also finds unreliable Defendant's statement that the law enforcement officials had "axes" with them. No further questioning was asked of Defendant regarding this statement and no evidence was proffered suggesting Defendant's actions were in response to the presence of axes. The court finds Defendant's testimony that Agent McLane's vehicle was the first law enforcement vehicle to arrive at 33 Serenity Lane not credible given Defendant argues in his brief that Agent Padian's questioning of Defendant, which occurred prior to Agent McLane's arrival, was unlawful. Finally, while Defendant testified that his consent to search the vehicle was never sought nor obtained, in his brief, Defendant states

otherwise.

A. <u>Agent Padian's initial contact with Defendant did not violate the Fourth Amendment</u>

Defendant argues in his brief that when Agent Padian initially approached Defendant, Agent Padian violated Defendant's Fourth Amendment rights "as the encounter did not occur in a public place but rather on private property." Def.'s Mem. Supp. Mot. Suppress at 3. In support of this position, Defendant argues he was not engaged in any suspicious or criminal activity and there is no caselaw holding that "a law enforcement officer has a right to approach an individual who is in a motor vehicle that is parked within the curtilage of a private property merely to ask questions." *Id.* at 4.

To the extent Defendant contends contact with law enforcement on private property was illegal, his argument is misplaced. With limited exceptions, the Fourth Amendment to the United States Constitution requires a warrant before the government can conduct a search of "persons, houses, papers, and effects." U.S. CONST. AMEND. IV. While a person's house lies squarely within the protection of the Fourth Amendment, the curtilage of a home – that is, the area around the home "harbor[ing] those intimate activities associated with domestic life and the privacies of home," *United States v. Dunn*, 480 U.S. 294, 300 (1987) – might not. *See Edens v. Kennedy*, 112 Fed. Appx. 870, 875 (4th Cir. 2004) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)). In particular, while access to the home is strictly forbidden in the absence of a warrant or exigent circumstances, *id.*, ordinarily, no Fourth Amendment violation occurs when the police conduct a knock-and-talk, that is, when the police knock on a resident's door or otherwise approach the residence seeking to speak to the inhabitants. *See Rogers v. Pendleton*, 249 F.3d 279, 289 (4th Cir. 2001) (explaining "police officers do not need a warrant to do what any private citizen may

12

legitimately do – approach a home to speak to the inhabitants"); *see Alvarez v. Montgomery County*, 147 F.3d 354, 357 (4th Cir. 1998) ("Police may approach a building, including the front entranceway to a residential dwelling, without committing a search where a person lacks a reasonable expectation of privacy in the area."); *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964) ("Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof – whether the questioner be a pollster, a salesman, or an officer of the law."). Homeowners, however, may take measures to impede or block access to the curtilage, and in those instances such privacy enhancements may prevent police access in a knock-and-talk. *See Edens*, 112 Fed. Appx. at 875 (explaining "if the owner of a home encloses the curtilage with a fence, locks the gate, and posts "No Trespassing" signs, the effect for Fourth Amendment purposes is to extend the walls of the home to the edge of the curtilage").

Here, there is no evidence that the home was Defendant's, and in fact, Defendant testified it was not his home and that he resided elsewhere. Tr. 75. Second, there was no evidence that the curtilage of 33 Serenity Lane was protected from entry by the public. Tr. 68. Finally, prior to their approach to the house, the agents had reasonable suspicion to believe that the home served as a stash house for a narcotics operation which supported the knock and talk investigation. Tr. 4, 15. To assure officer safety, Agent Padian was justified in checking the occupancy of the vehicles parked in front of the house and thereafter questioning Defendant. *Maryland v. Buie*, 494 U.S. 325, 336 (1990) (explaining a protective sweep extending to a limited inspection of spaces where a person

13

may actually be found may be conducted in the interest of officer safety). Accordingly, Defendant's argument is without merit.

B.  <u>The seizure of Defendant was supported by reasonable suspicion.</u>

Next, Defendant argues he was seized for the purposes of the Fourth Amendment once Agent Padian parked his car behind Defendant's vehicle and therefore, implies that the agents must have had reasonable suspicion at that point to have acted within the confines of the Fourth Amendment. Defendant argues further that to the extent "there is any doubt that such a seizure occurred when the first vehicle blocked" Defendant's vehicle, the position of three additional unmarked police vehicles, the wearing of bulletproof vests by the officers and the fact that Officer Stallings, who stood nearest to Defendant during the encounter, kept her hand on her service weapon, removes such doubt. *Id.* The government argues in its brief that Defendant was not seized. Gov't Resp. Opp'n Def.'s Mot. ("Gov't Resp.") at 6.

The Fourth Amendment assures individuals of the right to be free from "unreasonable searches and seizures." U.S. CONST. AMEND. IV. A seizure implicating the Fourth Amendment does not occur simply because a police officer approaches an individual and asks a few questions. *United States v. Farrior*, 535 F.3d 210, 218 (4th Cir. 2008); *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Rather, a "person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Smith*, 395 F.3d 516, 518 (4th Cir. 2005) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). A seizure is permissible under the Fourth Amendment if officers "have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity . . . ." *Id.* (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

14

Assuming *arguendo* that Defendant was seized, the court finds the officers had reasonable suspicion under the totality of the circumstances. Reasonable suspicion is somewhat less than probable cause, but it "does require a 'minimal level of objective justification' for the police action." *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). In determining whether there was reasonable suspicion, the court must look at the totality of the circumstances "to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted). "Additionally, officers are permitted to draw on their experience and specialized training to make inferences from and deductions about cumulative evidence." *United States v. Blanc*, 245 Fed. Appx. 271, 273 (4th Cir. 2007).

Here, Agent McLane testified to eight years of experience as an ICE agent and to 20 years of experience as a police officer. Tr. 29. Agent McLane's suspicion was supported by two specific, objective facts: (1) the exigency presented by an unidentified person in a car with tinted windows parked at a home suspected of serving as a stash house of a local narcotics operation and (2) Defendant's claim that he was an LPR but lacked documentation proving his immigration status. *See* 8 U.S.C. § 1357(a)(1) (noting immigration officers are authorized to question aliens, or those believed to be aliens, regarding their right to be in the United States). Taking these facts in concert, Agent McLane had an articulable suspicion that Defendant could have been engaged in criminal activity and therefore acted reasonably in further questioning Defendant.

C. <u>Defendant's consent was voluntary.</u>

Finally, Defendant argues that even if his seizure was lawful, the subsequent search of his vehicle was illegal because his consent to search was not given voluntarily. Def.'s Mem. at 8.

Generally, a search is constitutional under the Fourth Amendment only if conducted pursuant to a search warrant based on probable cause; however, voluntary consent is a valid exception to the requirements of both a warrant and probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Moreover, "[i]f an individual voluntarily consents to a search while justifiably detained on reasonable suspicion, the products of the search are admissible." *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001) (citation omitted). Whether consent was given voluntarily or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. *Id.* at 248-249. "It is well settled that consent may be inferred from an individual's words, gestures, or conduct." *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981); *see also United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003) ("Consent may be inferred from actions as well as words."). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citations omitted). The government bears the burden of proving by a preponderance of the evidence that consent was voluntary. *Schneckloth*, 412 U.S. at 248.

In considering the totality of the circumstances, the court may "consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (en banc). An individual need not be advised of his right to refuse consent, but lack of knowledge of this right is one factor that must be weighed.

16

*Schnecklock*, 412 U.S. at 227.

Here, there are no known characteristics of the defendant, such as age, maturity, education, intelligence, and experience, that suggest consent was involuntary. Defendant has lived in North Carolina with his two children for almost nine years, has a high school education and owns and operates a business. Defendant was able to converse intelligently with the law enforcement officials and never "display[ed] any characteristics that would render him incapable of voluntarily consenting or withholding consent to the search" of his vehicle. *United States v. Hinton*, 27 Fed. Appx. 252, 254 (4th Cir. 2001). Defendant argues that he was subject to a pat-down search, there were up to seven officers presents, the encounter took more than a few minutes and that officers had blocked in Defendant's vehicle with at least three of their own vehicles. While these factors raise legitimate concerns about the voluntariness of Defendant's consent, these factors alone do not weigh in favor of finding that Defendant's "will ha[d] been overborne and his capacity for self-determination critically impaired." *United States v. Watson*, 423 U.S. 411, 424 (1976) (quoting *Schneckloth*, 412 U.S. at 225). The evidence presented at the suppression hearing indicates there was little show of force. Defendant had only minimal contact with the officers with the exception of Agent McLane and Captain Holly. *See United States v. Elie*, 111 F.3d 1135, 1145 (4th Cir. Va. 1997) (finding defendant's consent voluntary even though "there were at least six officers present when [defendant] granted his consent to search"). Indeed, the focus of the knock and talk was the residence – not Defendant. Both Agents Cardwell and McLane testified that only Agent Stallings' gun was visible; however, she kept it holstered throughout the entire encounter. Also, the encounter took place during daylight hours and there were no issues regarding the conduct of the officers during the knock and talk, as they apparently obtained consent of the female occupant without using any sort of physical

17

intimidation. There was no evidence of threatening language or raised voices. While Agent Padian asked Defendant to step out of the vehicle before seeking his consent, this was not done in a hostile or intimidating manner. Prior to the search, Defendant engaged in small talk with Agent McLane and displayed no signs of nervousness or fear. Based on the totality of the circumstances, Defendant's consent was voluntarily given.[5] *See United States v. Troche*, 181 F. Supp. 2d 340, 347 (S.D.N.Y. 2002) (finding voluntary consent where officers did not have guns drawn, were in plain clothes and tone of voice calm even though defendant's car was blocked in by at least three law enforcement vehicles, defendant could not understand English and was subject to a pat-down search).

## VI. CONCLUSION

For the reasons set forth above, the court RECOMMENDS that Defendant's motion to suppress be DENIED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

---

[5] To the extent Defendant relies on the alleged encounter with an unknown member of law enforcement occurring at the side of the house, that encounter has no bearing on the voluntariness of Defendant's consent. Even accepting Defendant's version of the facts, this encounter occurred after Defendant consented and the gun was located.

This, the 7th day of July, 2011.

                                    Robert B. Jones, Jr.
                                    United States Magistrate Judge