IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-CR-65-FL

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | ORDER |
| DANIEL HERNANDEZ-SANCHEZ, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion to suppress (DE # 33). The government timely responded in opposition, and the motion was referred to Magistrate Judge Robert B. Jones, Jr. for an evidentiary hearing and a memorandum and recommendation ("M&R") (DE # 55). The magistrate judge recommends that the court deny defendant's motion. Defendant objected to that recommendation, and the issues raised are now ripe for decision. For the reasons that follow, the court adopts the magistrate judge's findings and recommendation, and denies defendant's motion to suppress.

## STATEMENT OF THE CASE

On March 15, 2011, the grand jury returned an indictment charging defendant with being an illegal alien in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 322(g)(5)(A) and 924. In this motion, filed April 21, 2011, defendant seeks an order suppressing physical evidence, specifically the gun and ammunition mentioned in the indictment, arguing that the vehicle search that resulted in the discovery of this evidence was unlawful under the Fourth Amendment. The government, responding in opposition, contends that the search was lawful.

On June 16, 2011, the magistrate judge held an evidentiary hearing at which Steve Cardwell ("Agent Cardwell") and William McLane ("Agent McLane"), special agents with U.S. Immigration and Customs Enforcement ("ICE"), testified. Defendant also testified on his own behalf at the hearing. On July 8, 2011, the magistrate judge entered his M&R. The magistrate judge found the testimony of Agent Cardwell and Agent McLane to be fully credible, and rejected the conflicting portions of defendant's testimony. The magistrate judge concluded that the officers had not violated the Fourth Amendment, and that defendant's motion to suppress should be denied. Defendant filed his objections to the M&R on July 23, 2011.

## STATEMENT OF THE FACTS

The court adopts the magistrate judge's credibility determination and his findings of fact, which are set forth in relevant part as follows.[1] On February 23, 2011, four ICE agents – Agent Cardwell, Agent McLane, Brian Padian ("Agent Padian"), and Candace Stallings ("Agent Stallings") – along with Greg Teller, a Harnett County sheriff's deputy, and Captain John Holly and Deputy Sturcke, two Lee County sheriff's deputies, were conducting "knock-and-talks" at several residences in Harnett and Lee counties, including 33 Serenity Lane, Lillington, North Carolina. The officers believed that the Serenity Lane property was connected to a narcotics smuggling operation. According to Agent Cardwell's testimony before the magistrate judge, various sources had identified the residence as being a stash house used by drug dealers to store drugs and money, and one of ICE's primary targets in the narcotics investigation, arrested the previous day, was in possession of a driver's license with the address of 33 Serenity Lane.

---

[1] The magistrate judge provided a detailed summary of the testimony for each witness, which is presented in this order in a condensed and unified format.

2

In preparation for the knock-and-talk, the officers conducted surveillance of 33 Serenity Lane from a staging area located a short distance away. The officers agreed that a "soft approach," meaning a low-key and non-threatening approach, would be used. They further agreed that Agent Cardwell and Agent Padian would make the initial approach, with other officers entering the premises for security purposes once the first two agents had made contact and obtained consent. Agent Stallings wore a ballistic vest displaying either "ICE" or "POLICE," and her service weapon was exposed. Agent McLane wore a jacket with "ICE" and/or "POLICE" written on it. All the other officers were in plain clothes.

A fence surrounded 33 Serenity Lane on all sides, save for an entry point wide enough for the entry and exit of a single vehicle. There was no gate or "No Trespassing" sign at the entry point. Prior to establishing the staging area, Agent Cardwell had observed a yellow Mitsubishi sedan and a white SUV parked in front of the residence at 33 Serenity Lane. He continued to observe the residence from the staging area for approximately two hours, and did not see any vehicles enter or exit the property.

After leaving the staging area, Agent Padian and Agent Cardwell entered the property together in an unmarked government vehicle. They noticed two females walking down the front stairs of the residence. Agent Padian, who was driving, parked behind the yellow Mitsubishi. The agents were unaware at the time that the yellow Mitsubishi, which had darkly tinted windows, was occupied. Agent Cardwell initiated a conversation with the two females, and Agent Padian approached the driver's side of the yellow Mitsubishi. Agent Padian saw someone in the yellow Mitsubishi, later identified as defendant, and informed Agent Cardwell of the same. Agent Cardwell then heard Agent Padian ask defendant to exit the vehicle and provide identification.

Agent Cardwell continued talking to the females and discovered that one was an occupant of the residence. He requested and obtained consent to speak with her inside, and later obtained her written consent to search the home. At some point, but definitely by the time Agent Cardwell entered the residence, Agent McLane and the other officers arrived on the scene. Agent McLane parked behind the white SUV, next to Agent Padian's vehicle. With all the officers on the scene, there were approximately four or five unmarked law enforcement vehicles parked near the yellow Mitsubishi, such that it would been extremely difficult to drive away in that vehicle.

Agent McLane was informed by Agent Padian that defendant had claimed to be a lawful permanent resident but did not have his green card on him. Agent McLane noted that a lawful permanent resident is required to carry his green card with him at all times. Upon further questioning by Agent McLane, defendant provided three inconsistent statements about his green card. He first advised that he had a green card, then that he did not have one, and finally that he had one but that it had been taken from him.[2]

Agent McLane continued to question defendant regarding his immigration status, asking where he was born, his reason for being on the premises, and where he was employed. Defendant explained that he owned a tire shop, owned both the yellow Mitsubishi and white SUV parked at

---

[2] Defendant makes two objections that must be addressed before continuing. First, defendant contends that neither the government nor the magistrate judge cited any legal authority for the proposition that a legal permanent resident must always carry a green card. But Agent McLane was correct that "[e]very alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him." See 8 U.S.C. § 1304(e). Moreover, "[a]ny alien who fails to [carry his green card with him] shall be guilty of a misdemeanor and shall upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than thirty days, or both." Id.

Second, defendant contends that his statements regarding whether he had a green card were not inconsistent, explaining that he had previously been granted a green card, but no longer had one because it was taken from him. Despite this attempt by defendant to explain the statements some five months after his interaction with officers, the magistrate judge was correct to note that the three statements are facially inconsistent and warranted investigation.

33 Serenity Lane, and was waiting to pick up one of the residents to clean his home. According to defendant's testimony before the magistrate judge, one of the females was a customer of his tire shop who had brought her vehicle in for repair, but the vehicle was repossessed while there. Defendant states that he loaned her his white SUV in exchange for cleaning services.

Agent McLane continued to engage in small talk with defendant. Agent Padian exited the home, advising officers that the female occupant had consented to a search of the home and directing them to seek consent to search the yellow Mitsubishi and white SUV. Captain John Holly, who was standing near Agent McLane and defendant, sought and received defendant's consent to search the two vehicles. Captain Holly searched the yellow Mitsubishi while Agent McLane searched the SUV. Defendant stood between the two cars. Captain Holly discovered a loaded firearm in the yellow Mitsubishi, and Agent McLane overheard defendant tell him that the gun was legal and registered, and had been purchased from a police officer. Defendant remained polite throughout the search and was undisturbed by the discovery of the gun.

Following the search of the vehicles, Agent McLane contacted the Law Enforcement Support Center ("LESC") to confirm defendant's immigration status. After he was informed that defendant was an illegal alien, Agent McLane placed defendant under arrest and drove him to the police station. The entire encounter between defendant and Agent McLane, including the time it took to verify defendant's immigration status with LESC, lasted no longer than twenty minutes.

## DISCUSSION

A.   Standard of Review

The district court reviews *de novo* those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a *de novo* review of

those portions to which a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the reasoning and recommendation of the magistrate judge. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

B.   Analysis

   1.   Defendant's Motion and the Magistrate Judge's Analysis

Defendant identified a number of alleged Fourth Amendment violations in his motion to suppress. He first argued that Agent Padian's initial contact with defendant was unlawful, contending that the Fourth Amendment does not permit an officer to approach an individual parked in a motor vehicle within the curtilage of a private residence to ask questions. The magistrate judge rejected this argument, comparing Agent Padian's conduct to the plainly lawful act of an officer approaching a residence and attempting to speak to the inhabitants inside. See, e.g., Alvarez v. Montgomery County, 147 F.3d 354, 357 (4th Cir. 1998) (citing United States v. Taylor, 90 F.3d 903, 908-09 (4th Cir. 1996)). The magistrate judge further noted that defendant did not live at the property, and that there was no locked gate or "No Trespassing" sign to keep away the officers. See Edens v. Kennedy, 112 F. App'x 870, 875 (4th Cir. 2004) (unpublished).

At the suppression hearing, defendant's counsel argued that, even if the officers were permitted to speak with defendant on private property, they were not permitted to seize him by

6

directing him to exit his vehicle.³ But the magistrate judge saw no constitutional infirmity in Agent Padian's checking the occupancy of the vehicles parked in front of the suspected stash house and directing any occupants out of their vehicle for officer safety. The magistrate judge compared Agent Padian's actions to an officer performing a protective sweep of a home, which is justified where officers have a reasonable belief that the area harbors individuals possibly posing a danger to the officers. See Maryland v. Buie, 494 U.S. 325, 333-36 (1990).

The magistrate judge, assuming *arguendo* that defendant was seized at some point during the encounter, concluded that officers had a reasonable suspicion justifying such seizure under the totality of the circumstances. See United States v. Smith, 395 F.3d 516, 518 (4th Cir. 2005) (holding that a seizure is lawful where officers have reasonable suspicion, based on objective facts, that an individual is involved in criminal activity); see also United States v. Arvizu, 534 U.S. 266, 273 (2002). The magistrate judge concluded that Agent McLane's suspicion was supported by (1) the fact of an unidentified person in a car with tinted windows parked at a home suspected of being a stash house of a local narcotics operation and (2) defendant's claim that he was a lawful permanent resident but lacked documentation proving his immigration status.

Finally, defendant suggested in his motion that his consent to search was not voluntarily given, even if his seizure was lawful. Again, the magistrate judge disagreed, noting that an individual may voluntarily consent even when justifiably detained, and that a judge must consider the totality of the circumstances in determining whether consent was given voluntarily or was the product of duress or coercion. See United States v. Boone, 245 F.3d 352, 362 (4th Cir. 2001). The

---

³ In his motion, defendant argued that defendant was seized not only when he was directed to get out of his car, but earlier when officers arrived and parked behind him, blocking his vehicle in.

magistrate judge further noted that the standard for voluntariness is one of objective reasonableness, see Florida v. Jimeno, 500 U.S. 248, 251 (1991), and that the burden is on the government to demonstrate voluntary consent by a preponderance of the evidence, see Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973). Applying relevant Fourth Circuit and Supreme Court law, the magistrate judge concluded that defendant's consent to search his vehicles was voluntarily given under the totality of the circumstances.

2.  Defendant's Objections

In his objections, defendant challenges many of the magistrate judge's conclusions. He renews his argument that he was seized once Agent Padian parked behind the yellow Mitsubishi, "regardless of [whether] the agent was aware" that the vehicle was occupied at that time. See Obj. 4. In any event, defendant contends that he was seized once he was directed out of the vehicle, before any discussion of his legal status occurred. Defendant further argues that sitting in a vehicle with tinted windows in front of a suspected drug stash house and lacking documentation to support one's lawful permanent resident status are not sufficient to support a suspicion that criminal activity is afoot. Finally, defendant argues that the unlawful seizure vitiates any consent to search later obtained, whether voluntarily given or not.

The court cannot agree that a seizure occurred simply because Agent Padian parked his vehicle behind what he believed to be an unoccupied car. Cf. Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989) (holding that a seizure does not occur simply because officers have terminated an individual's movement, unless they have done so through "means intentionally applied"). In fact, even once Agent Padian learned the car was occupied, failing to move his vehicle did not necessarily rise to the level of a "seizure." For example, in Miller v. Harget, 458 F.3d 1251 (11th

8

Cir. 2006), the Eleventh Circuit concluded that no seizure occurred when a law enforcement officer parked directly behind a vehicle at an extended stay hotel after noticing it weaving in and out of traffic prior to parking. The court held that it was "not dispositive that [the officer] would have prevented [defendant] from backing . . . out of the parking space," noting that defendant had not "demonstrate[d] that he had any intent to back out of the parking space when [the officer] pulled up behind him." See id. at 1257-58. Instead, the court held that whether the individual's car was blocked from backing out was only one factor to be considered in looking at the totality of the circumstances. See id. at 1258.

The Eleventh Circuit's approach, employed in a situation where a police vehicle blocks an individual from backing out of his parking space, is consistent with the Fourth Circuit's approach in other circumstances. The Fourth Circuit has held that "[a] 'seizure' for purposes of the Fourth Amendment occurs when, under the totality of the circumstances, a reasonable person in the suspect's position 'would not feel free to leave or otherwise terminate the encounter.'" See United States v. Perry, 560 F.3d 246, 253 (4th Cir. 2009) (quoting United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002)). Rather than focus on one or two specific facts (in this case, the fact that defendant's parked car was blocked in and that he was told to exit his vehicle), the Fourth Circuit focuses on "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen." Id. (quoting Weaver, 282 F.3d at 309-10); see also Miller, 458 F.3d at 1257, 1258 (also considering whether the individual's path is blocked or impeded; whether the individual's identification is retained by the officer during questioning; the

9

suspect's age, education, and intelligence, the length of the questioning, and the activation of a police vehicle's blue lights in looking to the totality of the circumstances).

In the circumstances presented here, the court cannot conclude that defendant was "seized" when Agent Padian parked behind him or when he was asked to exit his vehicle and provide his identification. At that time, there was only one unmarked police vehicle and two plainclothes officers present on the large lot. Neither officer had his service weapon visible, and Agent Padian did not activate his blue lights when pulling into the lot. There is no indication that Agent Padian's interaction with defendant was unpleasant, or that Agent Padian used a brusque or demanding tone of voice, or that he touched or physically detained defendant in any way. Indeed, Agent Padian's interaction with defendant was quite brief. Finally, there was nothing improper about Agent Padian's request that defendant step out his parked car and provide identification. See Florida v. Royer, 460 U.S. 491, 501 (1983) (noting that it is "no doubt permissible" to ask to see and examine an individual's driver's license); cf. Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) (noting the "inordinate risk confronting an officer as he approaches a person seated in an automobile"). These facts suggest that a reasonable person in defendant's situation would have felt free to terminate the encounter with Agent Padian at that time.[4]

Although the initial encounter with Agent Padian was not a "seizure," the government concedes that "once . . . defendant was identified as someone who may be an illegal alien, he did not have the authority to leave, regardless of where the cars were parked." See Tr. 109. Indeed, at

---

[4] The magistrate judge's analysis of the circumstances surrounding defendant's consent to the eventual search support this conclusion. The magistrate judge noted that "[t]he evidence presented at the suppression hearing indicates there was little show of force," that defendant had "only minimal contact with the officers," and that "the encounter took place during daylight hours. See M&R 17. The magistrate judge further noted that "[t]here was no evidence of threatening language or raised voices" and that Agent Padian's request for defendant to step out of the vehicle "was not done in a hostile or intimidating manner." See id. at 18.

10

about the time officers began to suspect defendant of being an illegal alien, the circumstances of the encounter changed dramatically, as additional law enforcement officers arrived on the scene. Although an individual may feel free to leave when speaking with one plainclothes officer outside of his parked car, he presumably would not feel free to leave when faced with seven officers, one of whom was wearing a ballistic vest and had a visible firearm, and when his vehicle is boxed in by four or five unmarked police vehicles. Accordingly, the court agrees with the government that, when Agent McLane arrived on the scene and began asking additional questions regarding defendant's immigration status, defendant was seized for purposes of the Fourth Amendment.[5]

By that time, of course, defendant had told Agent Padian that he was a lawful permanent resident but was not carrying his green card. That gave the officers *more* than the reasonable suspicion necessary to detain defendant; it gave them probable cause to believe that defendant had committed a misdemeanor offense by violating 8 U.S.C. § 1304(e), which requires aliens to have their green card on them at all times. See, e.g., Mountain High Knitting, Inc. v. Reno, 51 F.3d 216, 218 (9th Cir. 1995) (holding that § 1304(e) gave immigration officers probable cause to arrest individuals in factory who, when questioned, claimed lawful immigration status but stated that they were not in possession of their green cards). Moreover, as the magistrate judge noted, 8 U.S.C.

---

[5] The magistrate judge assumed *arguendo* that defendant was seized, but did not indicate at what point he assumed this seizure occurred. As set forth above, the court has concluded that defendant was not seized until the additional officers arrived on the scene and Agent McLane began inquiring into defendant's immigration status. Even were the court to find that the seizure occurred earlier, the magistrate judge is correct that such detention was justified by "reasonable suspicion, based on objective facts." See Smith, 395 F.3d at 518. Officers had observed defendant's yellow Mitsubishi and white SUV parked in front of 33 Serenity Lane for two hours, with no one entering or exiting the property. As already noted, they suspected the property of being a narcotics stash house, based upon the arrest of an individual the day before and information provided by other sources. Despite defendant's attempts to compare these facts to Brown v. Texas, 443 U.S. 47, 52 (1979) ("The fact that [defendant] was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that [defendant] himself was engaged in criminal conduct."), defendant's presence for at least two hours at a residence suspected of being a narcotics stash house provided ample objective evidence to support a reasonable suspicion that he was involved in criminal activity.

§ 1357(a)(1) permits an immigration officer to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." Accordingly, there can be no doubt that defendant's seizure following his statement that he was a lawful permanent resident but was not in possession of his green card was constitutionally permissible.

Defendant's sole remaining contention in his objections is that "[i]f the seizure of an individual is unlawful then any subsequent search of his person or property is likewise unlawful and vitiates any alleged voluntary consent to search." Obj. 7. The court has concluded that the seizure of defendant was lawful, however, and has no cause to consider whether an unlawful detention necessarily implies unlawfully-obtained consent. Defendant does not object to the magistrate judge's analysis under Boone and the cases cited therein, and the court discerns no error in the magistrate judge's consideration of the totality of the circumstances in this case. Accordingly, the court concludes that defendant's consent to search his vehicles was voluntarily given.

## CONCLUSION

Upon *de novo* review of those portions of the magistrate judge's M&R to which specific objections have been filed, and upon considered review of those portions of the M&R to which no such objection has been made, the court ADOPTS the findings and recommendations of the magistrate judge (DE # 55). For the reasons given above, defendant's motion to suppress (DE # 33) is DENIED.

SO ORDERED, this the 4th day of August, 2011.

LOUISE W. FLANAGAN
Chief United States District Judge

12